# DrinkerBiddle&Reath LLP

Michael C. Zogby
973-549-7209
Michael.zogby@dbr.com

Law Offices
600 Campus Drive
Florham Park, NJ
07932-1047

973-549-7000 phone
973-360-9831 fax
www.drinkerbiddle.com

A Delaware Limited
Liability Partnership

CALIFORNIA
DELAWARE
ILLINOIS
NEW JERSEY
NEW YORK
PENNSYLVANIA
WASHINGTON DC
WISCONSIN

June 4, 2014

The Honorable Michael A. Hammer, U.S.M.J.
United States District Court for the District of New Jersey
Martin Luther King, Jr. U.S. Courthouse and Federal Building
50 Walnut Street, Room 2C
Newark, New Jersey 07101

    Re:   **In re Neurontin Antitrust Litigation**
             **MDL Docket No. 1479; Master Docket No. 02-1390**

Dear Judge Hammer:

      I write on behalf of defendants Pfizer, Inc. and Warner-Lambert Company, LLC (collectively, "Pfizer") to supplement Pfizer's Motion to Exclude, In Part, The Testimony of Plaintiffs' Proposed Expert Witnesses Keith B. Leffler, Robert Carl Moy, And Peter Kissinger (Dkt. No. 649) ("Pfizer's *Daubert* Motion") and to update the Court on various legal developments since the filing of Pfizer's *Daubert* Motion, pursuant Your Honor's Order entered on May 29, 2014 (Dkt. No. 733).

## Background

      As Your Honor is aware, Pfizer's *Daubert* Motion and supporting papers were filed on September 17, 2012. (Dkt. Nos. 649-51.) Since then, Judge Hochberg has denied both sides' summary judgment motions by an Opinion and Order dated August 8, 2013 (Dkt. Nos. 688, 689). Subsequently, Pfizer reached a settlement agreement with the Direct Purchaser Class Plaintiffs, which was preliminarily approved by this Court on April 30, 2014 (Dkt. No. 727). However, Pfizer has not been able to reach a settlement with the opt-out plaintiffs, two groups of pharmaceutical retailers: (1) CVS Pharmacy, Inc., Rite Aid Corp., and Rite Aid HDQTRS. Corp. ("CVS/Rite Aid"), and (2) Walgreen Co., The Kroger Co., Safeway Inc., American Sales Co., Inc., Supervalu Inc., and HEB Grocery Co. LP ("Walgreen Plaintiffs") (collectively, the "Opt-Out Plaintiffs").

      By Order dated May 29, 2014 (Dkt. No. 733), Your Honor permitted the parties to renew their *Daubert* motions without the need to re-file the attendant motion papers, and instead allowed each party to supplement the prior filings with a five-page

Andrew B. Joseph
Partner responsible for
Florham Park Office

Established 1849

ACTIVE/ 75749365.1

letter setting out any subsequent legal developments affecting the *Daubert* motions, and identifying any portions of those motions that are not relevant to the case between Pfizer and the Opt-Out Plaintiffs (the "Opt-Out Action").

**All of the Arguments in Pfizer's *Daubert* Motion Remain Relevant to the Opt-Out Action, Except Passing References to Dr. Gary L. French.**

Very little has changed with respect to Pfizer's *Daubert* Motion and supporting papers. All but one expert—Dr. Gary L. French, Class Plaintiffs' purported damages expert—remain relevant to the Opt-Out Action. The Court should disregard the two limited references to Dr. French in Pfizer's *Daubert* papers. (*See* Pfizer's Mov. Br. (Dkt. No. 650) at 18 n. 17; Pfizer's Opp. Br. (Dkt. No. 665) at 13, 15 n. 10.) Because Dr. French did not opine on damages with respect to the Opt-Out Plaintiffs, his testimony is not relevant to the Opt-Out Action.

**Legal Developments Since Pfizer's *Daubert* Motion**

This Court's summary judgment opinion has strengthened Pfizer's *Daubert* Motion, underscoring why the Court should exclude at least one aspect of the testimony of the Opt-Out Plaintiffs' proposed expert Dr. Keith Leffler. The Opt-Out Plaintiffs proffer Dr. Leffler to support their claim that Pfizer had monopoly power and to opine on damages. Dr. Leffler opines that there is "direct evidence" of Pfizer's monopoly power because: (a) the price for Neurontin exceeded marginal costs and all average total costs that Pfizer was able to document; (b) the price of generics was lower than the price of Neurontin; and (c) sales of Neurontin declined significantly after generic entry. (Leffler Rpt. ¶¶ 19-25.)

In its *Daubert* Motion, Pfizer demonstrated that Dr. Leffler improperly disregarded certain required elements of the "direct evidence" test for establishing monopoly power, rendering his opinion contrary to law and inadmissible. (Mov. Br. at 9-10 (citing *Broadcom Corp.* v. *Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007); *In re Remeron Direct Purchaser Antitrust Litig.*, 367 F. Supp. 2d 675, 681 n.10 (D.N.J. 2005) (Hochberg, J.).) In particular, under well-established Third Circuit law, "direct evidence" of monopoly power cannot be established by showing supracompetitive pricing alone. *See Harrison Aire, Inc.* v. *Aerostar Int'l, Inc.*, 423 F.3d 374, 381 (3d Cir. 2005) (holding that supracompetitive price by itself did not support a reasonable inference of monopoly power), *cert denied*, 547 U.S. 1020 (2006)); *see also Broadcom*, 501 F.3d at 307 (holding that "direct evidence" must be shown through evidence of "supracompetitive prices *and* restricted output") (emphasis added).

In ruling on summary judgment, Judge Hochberg agreed that "proof of supracompetitive pricing cannot stand alone" to establish direct evidence of monopoly power. Op. at 9 (citing *Harrison Aire*, 423 F.3d at 381; *Broadcom*, 501 F.3d at 307). Dr. Leffler's opinion offers no basis other than his view that Pfizer engaged in supracompetitive pricing with respect to Neurontin for his conclusion that "Pfizer-Warner had monopoly power in the relevant economic market for the sale of gabapentin in the

U.S. until generics entered in 2004." (Leffler Rpt. ¶¶ 8(ii), 19-25.)[1] The opinion of Pfizer's expert, Dr. Monica Noether, on the other hand, will be of use to the Court and the jury because it takes into account that high price-cost margins are not on their own significant to determining monopoly power.[2] (*See, e.g.*, Noether Rpt. ¶¶ 8.3, 77, 83-87.)

Dr. Leffler makes no attempt to identify any other "something more" beyond supracompetitive pricing, as the law requires. Instead all three aspects of Dr. Leffler's testimony identified above are merely building blocks for his argument that Pfizer engaged in supracompetitive pricing. Not only does his direct evidence analysis fail to opine on whether Pfizer was restricting output of Neurontin, but he also conceded at his deposition that there was no such restricted output—admitting that there was no increase in the output of gabapentin after generics entered the market. (*See* Leffler Dep. at 156-57 (prior to generic entry, Pfizer generally increased its Neurontin output); Leffler Rpt. Ex. 2 (after generic entry, the total amount of gabapentin sold (Neurontin plus generics) remained virtually unchanged).)

Because Dr. Leffler's testimony can, at best, establish only one of the required elements of a direct evidence analysis, it is insufficient as a matter of law to establish the conclusion he offers and so inadmissible. *See, e.g., Bailey v. Allgas, Inc.*, 148 F. Supp. 2d 1222, 1243-46 (N.D. Ala. 2000) (excluding expert opinion that defendant's high rates of return alone established market power because such opinion was contrary to controlling case law), *aff'd*, 284 F.3d 1237 (11th Cir. 2002); *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 806 (N.D. Ill. 2005) ("Expert opinions that are contrary to law are inadmissible" because "[t]hey cannot be said to be scientific, to be reliable, or to be helpful to the trier of fact."); *Clements-Jeffrey v. City of Springfield, Ohio*, 2011 WL 3207363 (S.D. Ohio 2011) (holding that expert opinion was not relevant to the issues in the litigation because it was contrary to law). Accordingly, this Court should preclude Dr. Leffler from testifying that there is direct evidence of monopoly power for Neurontin.

We also note that at the pretrial conference on December 3, 2013 (Dkt. Nos. 719, 722), Judge Hochberg expressed skepticism about the Plaintiffs' theories of causation and stated that the Court was reconsidering the "speculativeness" of at least one of Plaintiffs' damages scenarios. (Dkt. No. 722, Tr. 13:15-16; *see also* 56:9-17.) Judge Hochberg also indicated that, if Plaintiffs' case were not "streamlined in a way that . . . makes sense and avoids too many suppositions," she would "take the matters into [her]

---

[1] Dr. Leffler's testimony concerning supracompetitive pricing for Neurontin is also unreliable and should be excluded because it is based solely on his improper use of the Lerner Index. As Pfizer argued in its *Daubert* Motion (Mov. Br. at 6-9), the Lerner Index is inapplicable to the pharmaceutical market is therefore unreliable in estimating market power. *See, e.g.*, Kenneth G. Elzinga & David E. Mills, *The Lerner Index of Monopoly Power: Origins and Uses*, 101 Am. Econ. Rev. 558, 559-60 (2011) (criticizing use of the Lerner Index in the pharmaceutical industry).

[2] Among other reasons, Dr. Noether's opinion is also useful because it considers how or whether certain factual questions—like Neurontin's competition with generics and therapeutic alternatives (Noether Rpt. ¶¶ 89, 117-18, Exs. C-1 – C-8) or cross-elasticity of demand (Noether Tr. at 199)—bear on the relevant market in this case.

own hands and do it." (Dkt. No. 722 Tr. at 63:6-8.) Just two weeks ago, Judge Hochberg asked the parties for pre-trial briefing on "the evidence Plaintiffs intend to offer at trial to prove causation for each of their two damages scenarios," echoing the skepticism of Plaintiffs' theories Her Honor expressed during the pretrial conference. Order dated May 21, 2014 (Dkt. No. 729). As the Court's summary judgment opinion acknowledged, as a factual matter, Defendants' alleged misconduct must have "materially caused [Plaintiffs'] alleged injuries . . . ." Op. at 19 (quoting *In re Neurontin Antitrust Litig.*, MDL No. 1479, 2009 WL 2751029, at *11 (D.N.J. Aug. 28, 2009)).

Judge Hochberg's concern with the "speculativeness" of at least one of Plaintiffs' damages scenarios lends further credence to the arguments in Pfizer's *Daubert* Motion that this Court should exclude Dr. Leffler's damages analyses as wholly speculative. Dr. Leffler's damages scenarios were not premised on the facts of this case, but rather presumed the viability of Plaintiffs' causation theories: the same theories that Judge Hochberg has now called into question. Even if such theories were viable, Dr. Leffler fails to take them properly into account; he ignores for purposes of his damages analysis certain of Plaintiffs' factual allegations surrounding the issuance and litigation of the '482 patent, as Dr. Noether points out in her testimony. (Noether Rpt. ¶¶ 18.1, 18.3, 149, 151.) By contrast, Dr. Noether's opinion draws on the facts surrounding the issuance and litigation of the '482 patent as they actually occurred. (*Id.*) Furthermore, Dr. Noether's damages opinion that Plaintiffs did not pay any overcharges because Purepac would not have entered the market sooner, even absent the alleged misconduct by Pfizer, is also based on facts in the record—those regarding Purepac's readiness to enter the market—that will be adduced at trial. (*Id.* ¶¶ 153-55.) Dr. Noether's opinion shows that, as a factual matter, any antitrust misconduct by Pfizer is not even a cause of the Plaintiffs' injuries.

Each of Plaintiffs' damages theories, on the other hand, is wholly speculative, with supposition built upon supposition. It is no wonder that Dr. Leffler himself expressed confusion about the theories at his deposition: "these are complicated scenarios, every time I go through them I get confused again." (Leffler Tr. at 26.) Leffler admitted that he has not, and cannot, determine whether the myriad assumptions underlying Plaintiffs' causation scenarios are reasonable. Rather, he assumed the theories to be true, relying on a mere "sound of confidence being emitted from [Plaintiffs'] counsel." (*Id.* at 61.) The weak foundation of Dr. Leffler's damages scenarios gives further credence to the arguments in Pfizer's *Daubert* Motion urging this Court to exclude, in part, Dr. Leffler's testimony, including his damages analysis.

Nor can Plaintiffs' expert Robert Carl Moy provide any basis to support Plaintiffs' tenuous theories of causation and damages. Plaintiffs proffer Professor Moy to support their claim that Pfizer delayed issuance of the '482 patent and filed sham litigation with respect to the '476, '479 and '482 patents. But, as Pfizer has argued in its *Daubert* Motion, Professor Moy's opinions regarding the patent infringement suits are unreliable because they are based on selective assumptions provided to him by Plaintiffs' counsel, rather than an independent investigation or analysis of the record. *See Crowley v. Chait*, 322 F. Supp. 2d 530, 542 (D.N.J. 2004) ("the selective furnishing of information

DrinkerBiddle&Reath

by counsel to an expert runs afoul of [FRE] 703, which, in addition to Rule 702, must be considered by a court for *Daubert* purposes") (citing *In re TMI Litig.*, 193 F.3d 613, 697 (3d Cir. 1999). Because Professor Moy performs no independent analysis of the factual record, his testimony provides no support for Plaintiffs' sham claims or causation theories and, therefore, will not help the jury to understand the evidence or to determine a fact in issue as the Rules of Evidence require.

*   *   *

For the reasons above, and those set forth in Pfizer's *Daubert* Motion and the accompanying papers, we respectfully request that the Court grant Defendants' Motion to Exclude, In Part, The Testimony of Plaintiffs Proposed Expert Witnesses Keith B. Leffler, Robert Carl Moy, and Peter Kissinger.

Respectfully submitted,

Michael C. Zogby

cc: Hon. Faith S. Hochberg, U.S.D.J.
All Counsel of Record (via ECF)

ACTIVE/ 75749365.1